**FARMERS CO-OPERATIVE CO.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 14802.

United States Court of Appeals
Eighth Circuit.

Dec. 2, 1953.

Neill Garret, Des Moines, Iowa (Thos. E. Mullin, Creston, Iowa, and Edward H. Jones, Galion, Ohio, on the brief), for petitioner.

Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, and Melvin Spaeth, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before SANBORN and THOMAS, Circuit Judges, and HARPER, District Judge.

THOMAS, Circuit Judge.

Petitioner herein (called respondent in the complaint of the General Counsel of the National Labor Relations Board) asks this court to reverse and set aside an order of the Board, and the Board asks that we enter a decree denying the petition and enforcing its order.

The petitioner, Farmers Co-operative Company, is a farmers co-operative association organized under the laws of Iowa with its principal place of business at Creston in Union County, Iowa. Its membership consists of between 1900 and 2000 farmer members. Frank Bentley is president of the company and C. O. Nelson its secretary. Harold F. Thomas is manager, which position he has held for nine years. Harold Bolton is office manager and James H. Porter is superintendent in charge of the work. The cooperative handles merchandise, feed, seed, grain, coal, and other products used by the farmers.

William L. Dudley was one of five to eleven employees of the company. He was first hired in September, 1948, and remained in its employ until he was discharged on March 7, 1952. His principal duties were to mix feeds and wait on customers. Prior to his employment by petitioner his left arm had been taken off just below the elbow, and he wore a prosthetic device in the form of a hook. This condition did not interfere with his performing the duties assigned to him.

This proceeding was commenced by a complaint filed by the General Counsel of the National Labor Relations Board pursuant to its regulations, June 30, 1952, on behalf of the American Federation of Grain Millers, A. F. of L., referred to as the Union.

The complaint charged that the petitioner herein did on March 7, 1952, discharge its employee, William L. Dudley, and has failed and refused to reemploy him for the reason that he joined and assisted the Union, and engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection; and that thereby the Company engaged in unfair labor practices within the meaning of § 8(a), subdivision 3, of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

The complaint charged, also, that the petitioner "from on or about February 1, 1952, the date of the issuance of this complaint, did question its employees about their union beliefs, activities and support, and did warn its employees that the work week would be reduced if the Union was successful in organizing its employees", thereby engaging in unfair labor practices within the meaning of § 8(a), subdivision (1) of the Act.

In answer to the complaint the petitioner denied that Dudley was discharged because of union activities, but alleged that he was discharged for misconduct, insubordination, and failure to perform his duties; denied that its officers and agents questioned its employees about their union beliefs, activities and support; denied that it warned its employees that the work week would be reduced if the Union were successful in organizing its employees; and denied all charges in the complaint to the effect that it was in any way violating the Act.

A hearing was held before a Trial Examiner at Creston, Iowa, on July 16 and 22, 1952. Thereafter the Examiner filed his report on September 23, 1952, finding the petitioner guilty as charged. He recommended that the Board order the petitioner to cease and desist from inter-

fering with its employees in their union activities; to offer Dudley reinstatement to his former job and to pay him such sum as he would have earned from March 7, 1952, less outside earnings; and he recommended that the petitioner be required to post notices such as are usually required in like cases. Exceptions and objections to the report were filed by the petitioner; but on January 13, 1953, the Board entered its decision adopting the Examiner's findings and entering the order recommended by the Examiner.

The petitioner has filed its petition in this court for review and to set aside the Order of the Board; and the Board has filed its answer to said petition and its request for enforcement of the order.

It is the contention of the petitioner in this court that the findings and order of the Board are not sustained by substantial evidence, but that they are unwarranted, unjustified and illegal.

The problem presented here, therefore, is to determine whether the findings and order of the Board are supported by substantial evidence within the meaning of the Labor Management Act. That Act, 29 U.S.C.A. § 160(e), provides that in proceedings before a United States Court of Appeals to review or to enforce an order of the Board, "The findings of the Board with respect to questions of fact if supported by substantial evidence *on the record considered as a whole shall be conclusive.*" (Italics supplied.)

Prior to the enactment of the Labor Management Relations Act (Taft-Hartley Act) the United States Courts of Appeals applied the rule that the findings of fact of the Board, if sustained by substantial evidence, were conclusive on review. After the enactment of the cited statute, some of the Courts of Appeals, including this court which has always reviewed cases after consideration of the entire record, were of the opinion that no material change had been made in the scope of review of the orders of the Board or its function as the trier of the facts. The Second Circuit was in agreement with the views of this court, and the Supreme Court granted certiorari in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; 2 Cir., 179 F.2d 749, 752. The opinion of the Court of Appeals in that case was written by Chief Judge L. Hand. In the opinion Judge Hand said: "We cannot agree that our review has been 'broadened' * * *" by adding the phrase "on the record considered as a whole."

In reversing the decision of the Second Circuit in the Universal Camera Corporation case, the Supreme Court said, 340 U.S. at pages 487–488, 71 S.Ct. at page 464, of the report:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight * * * such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment.

"* * * Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

■ While here the Board adopted the findings of fact of the trial examiner who saw and heard the witnesses testify, which the Board did not do in the Universal Camera Corporation case (see page 492 of 340 U.S., page 466 of

71 S.Ct.), we are not barred from setting aside the Board's decision if we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

█ The goal to achieve in reviewing the whole record is to make "a rational inquiry into truth" for the purpose of judicially administering justice according to law. And in considering this case we must bear in mind what the Supreme Court say in the Universal Camera Corporation case, supra, 340 U.S. at page 490, 71 S.Ct. at page 466:

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals."

At the hearing before the trial examiner three witnesses were called by counsel for the Board to support the charges against the petitioners. Mr. George D. Weiny, general vice-president of the Union, testified only that he was in charge of this particular district for organizing and settling labor disputes and negotiating union contracts; and that he filed the original charge in this matter.

William L. Dudley whose discharge occasioned this proceeding testified that he was employed as a feed mixer; that he took orders from Harold Thomas, Harold Bolton and Homer Porter, his superiors. His testimony referred chiefly to two conversations with Mr. Thomas, the manager, the first just after noon on March 3d, and the second on March 7th. At the first interview Thomas said to him: "What is this I heard that you are the head of the union move?" I said I wasn't the head of it. He (Thomas) said he was going to have to let me go. I told him that was up to him, I wasn't going to quit. I told him I thought the union would be all right; We needed something in there. Thomas said, "Well, I am just going to let you go"; that he wouldn't be there to be our boss if the union came in; that he wouldn't work under the union or with it; he would fire the whole crew and start over new. Mr. Thomas did not discharge him that day; "he told me he depended on me in the mill room."

He testified that on March 5th he had a conversation with Homer Porter in which Porter told him that he was going about it in the wrong way and then said that if we wanted a union we should talk to Mr. Thomas about it. "I told him that we didn't have to ask Mr. Thomas about it." Porter said they were going to get up a petition and fire me "if we got the union in. There were three of us working there, including Mr. Porter, Russell Hardisty, and I believe Claude Nash. I told him why didn't he just fire me and leave the other fellows alone. Porter made no reply."

Dudley next testified to his version of the events of March 7th. He said that he was discharged at about two o'clock in the afternoon by Harold Thomas. The substance of his testimony was that he was waiting on customers when Thomas came back and said, "What is this I hear that you are telling the boys if they don't join the union they will be fired?" I said I hadn't told them that. He then told Thomas about his conversation with Mr. Porter. Thomas then asked him in regard to his attitude, and he testified that he answered: "By God I am in [the union] and I am going to stay in." And Thomas told him to go

get his time then. "I went on in to the mill room and when I came back I stopped and talked to him [Thomas]. I told him I hoped he knew what he was doing because I was going to cause him some trouble over it * * * the exact words I used were 'I hope to hell you know what you are doing, Mr. Thomas, because I am going to cause you some trouble over it.'" He was then "paid off." He said Thomas gave no reason for firing him.

On cross examination he testified that he knew the work in the mill room was not being done on time; that there was dissatisfaction and partiality being shown to some of the workers, and that at his meeting with Thomas on March 3d Thomas "told me he depended on me taking care of it back there."

He talked to the men in the shop during working hours about signing up union cards. He procured the signatures of three of the men during work hours and five other signatures were procured by Mr. Baum at the hotel. On March 3d after he told Thomas he was going to continue his union activity Thomas told him to go back to work. He had criticised the way the work was done back in January and he held Dudley responsible for it. He said the members of the board were on his back for the way the work was being done. Dudley said that he did not "cuss" Thomas on March 7th nor did he call him a son-of-a-bitch.

Harold Bolton, assistant manager, called as an adverse witness, testified regarding a conversation with an employee named Claude Nash with respect to the union during the period the employees were interested in organizing a union. The conversation took place at the plant. He told Nash that in his personal opinion he did not see how the union would benefit him; that they were talking about big money and that the economy of the company was such that they could not increase costs too far; that in his opinion it would not help him in his carry-home pay; that the rates of pay he had heard rumored would run costs up to a point where they could not work the men full time. They had been working the men 54 hours a week and paying them for time and a half for all over 40 hours; the company had had a poor year because of poor crops, and it could not afford to raise wages; if wages were raised the men could not be paid for overtime; that in case of any substantial increase in wages, whether brought about by the union or not, it would necessarily result in a reduction in overtime. He did not say that if the union were kept out the men would get more money.

Eight witnesses testified for the petitioner. Mr. Frank Bentley, president of the company, testified that he is a farmer living on a farm west of Creston; that 90 per cent of the business of the company is done with its members; that there are between 1900 and 2000 members; that the board of nine members meets once a month. He had known Mr. Dudley since he was first hired by the Co-op; that he seemed to get along very well for a time and then things became unsatisfactory. On several occasions things were unsatisfactory in his own business with the company. Dudley's conduct was discussed at several meetings of the board beginning in November, 1951. Some board members had complaints about the way Dudley discharged his duties; in the way he mixed feeds; that he did not do his work satisfactorily; and that he refused to wait on old ladies. The board recommended in November that Thomas discharge Dudley. When he did not do so the board at the next meeting inquired why it had not been done. Mr. Thomas said he hoped he could get it ironed out; he knew that Dudley needed the job and he was sympathetic with him and he hoped that Dudley could be kept.

Bentley also testified that he had been a union member and that he had no objections to unions whatever.

On cross-examination Mr. Bentley testified that the reason Dudley was discharged was because he cussed Mr. Thomas, the manager.

Harold F. Thomas, the manager, testified that he had direct charge of hiring and firing employees. He makes regular reports to the board at its monthly meetings. Employees are never discussed at the meetings unless there is something unusual about it. He employed Mr. Dudley and assigned him to the mill room to mix feed, unload cars, wait on customers and do whatever there was to do. Dudley was responsible for what was done in the feed room.

Several customers, including members of the board, complained about Dudley. Some asked why he kept Dudley back there. They complained that he was grouchy and did not cooperate with the customer members of the association; and that the feeds were not properly mixed.

The board complained to him about Dudley's conduct toward customers and his general attitude at the meetings of the board in November and December, 1951, but "I always stuck up for him because I knew he needed the job and we had always been friendly." They took it up again in January, 1952, and wanted to know why we were not getting rid of Bill Dudley, mentioning the fact that the service was extremely poor; and "I said, 'Well, I will try to get it straightened out.'" They again recommended that Mr. Thomas get rid of him. A few days after the board meeting he had a meeting with all the employees in the mill room and told them of the complaints and that things must be straightened out and better service given and that he was going to let the chips fall where they may, hoping Bill Dudley would see the light.

Complaints continued to come in and he called Bill down. In the meantime he had heard that union activity was going on in the mill room. He considered Bill to be a friend of his and he decided to ask him about it. So he called Bill Dudley down in the basement and asked him about it. Bill said he guessed it was true. He told Bill that his attitude was wrong and told him that the board of directors had ordered him to be fired

and that he was putting Thomas in a terrible spot, but that "I had not fired him"; and he told Bill at that time that "if the union came in I was leaving, that I wasn't going to stay probably; that I did not want to work among trouble." This was a friendly conversation. Dudley said: "Well, don't fire me because I have got another house and I haven't got it paid for", and he owed payments on his car. So he said: "Well, Bill, if you will get things straightened out and go back to work, we will forget about it." They went back up the stairs on friendly terms.

A few days later, on March 7th, Homer Porter reported to Thomas that Bill had been telling the employees if they did not join the union they were going to lose their jobs. Thomas then went to see Bill Dudley and said; "Bill, have you been telling the boys [the employees] that if they don't join the union they will lose their jobs? He says, 'God damn it, I knew I was going to get the blame for it, but you sons of bitches can't get by with it. I know my rights.'" Dudley did not deny that he had threatened the men. Homer Porter came along at that time and he was asked if the "boys" [employees] had told him this story, and he said they had. Dudley was there then, and "I said: 'Bill, if your attitude is like this I am going to give you your check.' Bill said: 'You can't fire me. I have my rights. You will get into a hell of a lot of trouble.' * * * We had been friendly before that."

"I discharged him then because he called me a son of a bitch. I would fire anybody who called me a son of a bitch. I did not fire him because he was working for the union."

Mr. Thomas knew after their first meeting on March 5th that Dudley was working for the union because Dudley had told him that he was in favor of the union, but he did not discharge him for that.

James Homer Porter testified that he was plant superintendent of the petitioner's business. His duty was to over-

see the mill room and other departments. He had charge of the employees. He knew Dudley well and knew the complaints made in regard to the way he treated customers. Dudley was not on friendly terms with the men in the mill room. He told them they would lose their jobs unless they joined the union, and the employees came to him (Porter) to find out if that were true. Porter reported this matter to Mr. Thomas. Porter was present when Thomas asked Dudley about it and heard Dudley curse Thomas and call him a son of a bitch.

C. O. Nelson testified that he had been a member of the board of the petitioner for about 18 years, and that he had been secretary for four years. He had heard the complaints about Mr. Dudley and had heard the board recommend his discharge.

Russell E. Hardisty had worked for the petitioner since the middle of November, 1950. He worked in the mill room with Mr. Dudley and other employees. At times he had disagreements with Mr. Dudley over the union beginning in February, 1952. "He informed me that if I did not sign the union card I would lose my job if the union came in." He heard similar conversations with other men working there. Dudley told them they would either sign the union card or lose their jobs. He talked with Mr. Thomas about it, and Mr. Thomas told him that if it would help him to get on with Bill to go along and sign it. He also testified that Dudley was very sarcastic with customers. When he spoke to Dudley about it, Dudley said that he didn't give a damn about the customers. That was in January or February, 1952.

Merle McKinney was an employee, also, in the mill room. He testified that Mr. Dudley talked to him about joining the union and that Dudley told him that he would lose his job unless he joined the union. He reported this to Mr. Porter who told him to go ahead and sign if it would help him to get along with Bill, that "I wouldn't lose my job either way."

William George Jones testified that he worked at the co-operative from January, 1952, until April, 1952, and that he knew Mr. Dudley. Dudley talked to him quite a bit and Dudley got up a meeting and he, Jones, went with him to the meeting of the union where a man "gave us a big song and dance about what an advantage it would be"; so he signed one of the union cards, but he "found out later that I didn't see where it was going to do any good", and he refused to go to another meeting. He heard Dudley say to some of the other employees "that they would no longer be employed there if they didn't sign." He and other employees discussed it with Mr. Porter and he did not say whether they should sign or not. Later Mr. Porter asked him how Mr. Dudley was getting on, and "I said he seems awful bitter toward the customers and people that would come in there and want stuff and one thing and another, and that he would kind of snap them quick like to get rid of them." And he reported that to Mr. Bolton. Then he was asked: "Q. Did anybody connected with the Co-op ever tell you that you should not join the union and couldn't join it or you would lose your job? A. No." On cross examination he said that the employees did not want the union.

Darl Olson drove a truck for the Co-op for three years. He had talked with Mr. Dudley, and he had a conversation with Mr. Porter about "signing the union." He asked Mr. Porter whether he would lose his job if he joined the union and Porter said it would make no difference.

In rebuttal William Dudley denied that he called Mr. Thomas a son of a bitch.

Harold Thomas, recalled, testified that he never threatened to discharge Mr. Dudley for joining the union.

Since the Board adopted the findings and recommendations of the trial examiner the only question for determination is whether the findings of fact are "supported by substantial *evidence on the record considered as a whole*". 29 U. S.C.A. § 160(e) (Italics supplied.) Be-

cause that test must be applied we have summarized all the pertinent evidence. As pointed out in the Universal Camera Corporation case, supra, the evidence contradicting the testimony relied upon by the Board must be considered by the court on review. The trial examiner reached his conclusion by not crediting the testimony of any of the witnesses for the petitioner whose testimony was inconsistent with his own conclusion. For example, in his report he says: "* * * I do not credit the testimony of President Bentley or Manager Thomas that the directors in the fall or winter of 1951 recommended Dudley's discharge." But the President and Thomas were corroborated by C. O. Nelson, a member of the board for 18 years and secretary for four years.

We are interested in the approach of the trial examiner to the consideration of the testimony of the witnesses. An illustration of that approach is found by reference to the testimony of employees Hardisty, McKinney and Olson that Dudley told them that failure to join the union would or might result in their discharge. Had Dudley been discharged for making these threats, the examiner says, "the General Counsel's complaint would fall." But in arriving at the conclusion that Dudley did not curse Thomas before his discharge he does not credit the testimony of Mr. Thomas or of Mr. Porter with reference to the insulting language used by Dudley and for which he was discharged.

In considering the evidence on the record as a whole it is apparent that the examiner and the Board did not credit the testimony of nine of the witnesses who testified at the hearing. They were Frank Bentley, president; C. O. Nelson, secretary; Harold Thomas, manager; Harold Bolton, office manager; James H. Porter, superintendent; Russell Hardisty, Merle McKinney, William Jones, and Darl Olson, fellow employees. The testimony of William Dudley was the only testimony believed.

In so finding it seems clear to us that the examiner did not fairly consider the evidence. It will be remembered that the last conversation referred to occurred on Friday, March 7, 1952. There were three persons present at the time, Mr. Thomas, Mr. Porter, and Mr. Dudley. Mr. Thomas, it is agreed, asked Mr. Dudley, "What is this that I hear that you are telling the boys if they don't join the union they will be fired?" Dudley replied that he had not told them that, and then "He [Mr. Thomas] asked me if that was my attitude toward it, and I said, 'By God, I am in and I am going to stay', and Thomas told me 'I could go get my time then.'" Both Mr. Thomas and Mr. Porter testified that Dudley grew angry and cursed Mr. Thomas most profanely. If their testimony is to be considered at all as a part of the "record as a whole", certainly the preponderance of the evidence justified the discharge of Dudley. Section 10(c) of the National Labor Relations Act provides that

"No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

██ Since it is the duty of this court to determine insofar as is humanly possible what the truth is (Universal Camera Corp. v. National Labor Relations Board, supra), we have read the entire record with that duty in mind and can reach no conclusion other than that the examiner and the Board erred in finding and holding that Mr. Thomas, manager, and Mr. Porter, plant superintendent, lied when they testified in reference to Mr. Dudley's conduct on March 7, 1952. Mr. Dudley's own testimony discloses that he was angry and used coarse and vulgar language.

██ It is not denied that the discharge of an employee for wrongful conduct is an inherent power of management and one expressly protected by law. Shell Oil Co. v. National Labor Relations Board, 5 Cir., 196 F.2d 637. An employer may hire and discharge at will, so

long as the action is not based on opposition to union activities. National Labor Relations Board v. Tennessee Coach Co., 6 Cir., 191 F.2d 546. And see Wayside Press, Inc., v. National Labor Relations Board, 9 Cir., 206 F.2d 862.

The Board properly assumed the burden of proof in this case and relied solely on the testimony of Dudley, the discharged employee, whose self-interest and bias were obvious. A fair consideration of the record is convincing that the finding that the petitioner violated § 8 (a)(1) of the Act and/or § 8(a)(3) is not supported by "substantial evidence on the record considered as a whole." It is clear that Dudley was guilty of misconduct justifying his discharge.

The petition to set aside the order of the Board is granted and the request of the Board for enforcement of the order is denied.