236 F.Supp. 831 (1964)
Ex parte Louis FORD, Ian Grand, Benjamin Goins, Roberta Tournour, Taylor Jones, Kenneth Lee, and Ronald Glenn, Petitioners,
v.
William BOEGER, Warden of St. Louis City Jail, Respondent.
No. 64 C 53(2).
United States District Court E. D. Missouri, E. D.
December 18, 1964.
*832 Robert L. Witherspoon, Charles R. Oldham, Joseph S. McDuffie, Robert E. Wilson, Jr., Clyde S. Cahill, Jr., Emanuel Williams, Margaret B. Wilson, Wyvetter H. Younge, Robert E. Ratermann, St. Louis, Mo., for petitioners.
Thos. J. Neenan, City Counselor, Eugene P. Freeman, Associate City Counselor, Conway B. Briscoe, Jr., Assistant City Counselor, St. Louis, Mo., for respondent.
Wayne L. Millsap, John P. Montrey, St. Louis, Mo., amicus curiae.
MEREDITH, District Judge.
This matter is pending before this Court on petitioners' application for a writ of habeas corpus.
The petitioners were found guilty of criminal contempt in the Circuit Court of St. Louis, Missouri, for violating an injunction issued by that Court. The St. Louis Court of Appeals quashed the petitioners' writ of habeas corpus. The application for a writ of habeas corpus to the Supreme Court of Missouri was denied. This Court, 227 F.Supp. 438, dismissed the petitioners' application for *833 writ of habeas corpus on the ground that they had not exhausted all remedies available to them in the State of Missouri. More particularly, that they had not applied to the Supreme Court of the United States for a writ of certiorari. The petitioners appealed to the Eighth Circuit Court of Appeals, and the Eighth Circuit remanded, Curtis v. Boeger, 331 F.2d 675, saying that the petitioners were not required to petition the Supreme Court of the United States for writ of certiorari and further determined that they had exhausted their state remedies within the case of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The Eighth Circuit in remanding ordered this Court to consider whether the issues sought to be raised are such as to call for a hearing under Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L. Ed.2d 770 (1963).
In the Townsend case, supra, the Supreme Court laid down the following guide for the federal district courts to follow in habeas corpus cases:
1. It must first be determined whether petitioner's allegations, if proved, would establish the right to his release, Townsend case, supra, l. c. 307, 83 S.Ct. l. c. 754. The petitioners in this case are entitled to be released if they can show that they were denied any of their fundamental liberties.
"* * * State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Townsend, supra, l. c. 312, 83 S.Ct. l. c. 756.
2. If it is found that the petitioners have alleged a deprivation of constitutional rights, then the remaining question is whether this Court is required to hold a hearing to ascertain the facts which are necessary before this Court can make a decision on the ultimate constitutional question, Townsend, supra, l. c. 309, 83 S.Ct. l. c. 755. When does a federal district court have to hold a hearing? The Supreme Court said in the Townsend case, supra, l. c. 312, 83 S.Ct. l. c. 757, that the appropriate standard is this:
"* * * Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceedings."
The Supreme Court set out a more particular guide for the federal district courts to determine whether an evidentiary hearing to a habeas applicant is required. The Supreme Court said under the following circumstances such hearing must be granted, Townsend, supra, l. c. 313, 83 S.Ct. l. c. 757:
"* * * If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."
The first step is to determine if the allegations in the petitioners' application, if proved, would establish the right to their release. After reading the petitioners' application for writ of habeas corpus, this Court is of the opinion that the following allegations, if proved, would establish the right to their release:
1. That the Circuit Court of St. Louis did not have jurisdiction to issue the restraining order which they were found to have violated; In re Green, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962).
2. That they did not receive the type of hearing which is required under *834 the Fourteenth Amendment in a criminal contempt case. In re Green, supra.
The other contentions in the petitioners' application are not fundamental liberties which are protected by the Federal Constitution:
(1) the Supreme Court of Missouri failing to resolve a conflict of opinions between the Springfield Court of Appeals and the St. Louis Court of Appeals on the interpretation of Supreme Court Rule 92.09, V.A.M.R. and Mo.R.S. 1959, § 526.070, V.A.M.S., as to the requirements of the indemnity bond;
(2) The fact that under Missouri law a person found guilty of criminal contempt has no appeal but through habeas corpus, which is the same as an appeal in a criminal contempt case, see Curtis v. Tozer, 374 S.W.2d 557 (Mo. App. 1964), except the petitioners had to stay in jail while seeking a review, will not be considered because it is a moot question now;
(3) It is not a denial of a person's fundamental liberty to be punished for contempt of court for violating a restraining order where he had actual notice of the restraining order and proceeded to violate it, even though he was not named in the restraining order;
(4) When a Court has jurisdiction over the person and subject matter, and issues a restraining order, the parties must obey the restraining order until it is reversed by orderly and proper proceedings. If they do not obey the restraining order, they can be punished for criminal contempt. United States v. United Mine Workers, 330 U.S. 258, l. c. 293, 67 S.Ct. 677, l. c. 695, 91 L.Ed. 884 (1947);
(5) Also, assuming that the sentences and fines were excessive, this Court does not have jurisdiction in a writ of habeas corpus to order their correction. Terrell v. Biddle, 139 F.2d 32 (8th Cir. 1943), cert. den. Terrell v. Pescor, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083, rehear. den. 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593, rehear. den. 322 U.S. 769, 64 S.Ct. 1053, 88 L.Ed. 1594. Conley v. Cox, 138 F.2d 786 (8th Cir. 1943). Also see 4 Barron & Holtzoff, Federal Practice and Procedure § 2303.
The next question to be decided is whether under the Townsend case, supra, this Court is required to hold a hearing to ascertain the facts. After reading the petitioners' application and brief, it appears to this Court that the facts are not in dispute, but only the conclusion of law. Therefore, this Court according to the Townsend case, supra, is not required to hold a hearing. The Supreme Court in the Townsend case, supra, 372 U.S. at 312, 83 S.Ct. at 757, said the following:
"* * * The appropriate standard * * * is this: Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." (Emphasis added.)
Since the facts are not in dispute a hearing is not needed.
For a detailed statement of the facts see Curtis v. Tozer, supra, where the St. Louis Court of Appeals for the State of Missouri reviewed the facts of this case, as well as the facts of two companion cases. This case in the St. Louis Court of Appeals opinion is referred to as No. 31,778.
The Jefferson Bank and Trust Company received a letter from the "Chairman of CORE", dated August 14, 1963, stating that if four full-time negroes were not hired in clerical positions within two weeks, CORE would take direct action against the bank. August 27, 1963, the Bank replied rejecting the proposal, stating that the Bank had no openings. The letter also pointed out that it had learned that CORE planned to sit-in, stand-in and lie-in the Bank on Friday, August 30, 1963.
*835 To prevent such demonstrations the Bank obtained a temporary restraining order on August 30, 1963, which was in the following style:
"The Jefferson Bank and Trust Company, a corporation,
vs.
Robert B. Curtis, William L. Clay, Charles R. Oldham and Marian Oldham, Lucien Richards, Richard Daly, Walter Hays, Rev. Charles Perkins, Norman Seay, Herman Thompson, Melvin West, Individually and as representatives of a class known as St. Louis Committee of Racial Equality.
"No. 57945-E."
The temporary restraining order required the defendants to "desist and refrain" from demonstrating so as to prevent the operation of the Bank's business, etc., at the Jefferson Bank and Trust Company, until the hearing of and ruling upon the order to show cause. Peaceful picketing was not prohibited. The acts the temporary restraining order prevented are quoted in the Curtis case, supra.
The first alleged violation of the restraining order took place on August 30, 1963, which case is pending in this Court, No. 64 C 53(3), and it was one of the companion cases to this case in the Circuit Court of Appeals' decision reported in Curtis v. Tozer, 374 S.W.2d 557 (1964).
The St. Louis Court of Appeals said that the best explanation of why the motion for attachment was filed against these petitioners is stated in the brief filed by the petitioners in the St. Louis Court of Appeals. The brief says:
"On Friday, October 4, 1963 the petitioners herein went to the Jefferson Bank and Trust Company and entered said bank carrying signs pinned or fastened to them reading `4 JOBS'. Inside the bank they sang freedom songs, locked arms, sat and stood in front of the entrances of said bank. While petitioners were inside said bank, an official of the bank read to them a copy of the restraining order dated August 30, 1963. The petitioners had not prior to that time been served with a copy of the restraining order. After said order was read by the official of the bank, a request was made to petitioners to leave the bank. The petitioners refused to leave the bank. There were on hand police officials who promptly arrested petitioners and placed them in custody, removed them bodily from the bank to the police headquarters. They were all charged with peace disturbances and with trespassing. The arrests and placing petitioners in custody took place between 4:00 p. m. and 6:00 p. m. on Friday, October 4, 1963." Curtis v. Tozer, supra, l. c. 596.

JURISDICTION
This Court must determine whether the Circuit Court of St. Louis has jurisdiction to issue a temporary restraining order preventing sit-ins, lie-ins and stand-ins for the purpose of obtaining four jobs for negroes.
The petitioners claim that under the National Labor Relations Act, CORE's demand that Jefferson Bank and Trust Company hire four negroes is a labor dispute involving an unfair labor practice under 29 U.S.C.A. § 157, which is within the preempted field of the federal government.
To determine whether the petitioners' contention that the Circuit Court of St. Louis did not have jurisdiction over the subject matter, this Court must answer the following questions:
1. Was there a labor dispute?
2. If there was a labor dispute, did it involve an unfair labor practice under 29 U.S.C.A. § 157, which is within the preempted field of the federal government?
The term "labor dispute" is defined in the Norris-LaGuardia Act, 29 U.S.C.A. § 113(c), and the National Labor Relations Act, 29 U.S.C.A. § 152(9). The following *836 is the definition under 29 U.S.C.A. § 113(c):
"(c) The term `labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."
The definition of "labor dispute" under the National Labor Relations Act, 29 U. S.C.A. § 152(9), is very similar to the definition of a "labor dispute" under the Norris-LaGuardia Act, supra. The following statement by the Supreme Court of Pennsylvania in Navios Corporation v. National Maritime Union of America, 402 Pa. 325, 166 A.2d 625, 630 (1960), cert. den. 366 U.S. 905, 81 S.Ct. 1047, 6 L.Ed.2d 204 (1961), rehear. den. 366 U.S. 941, 81 S.Ct. 1658, 6 L.Ed.2d 852 (1961), is significant:
"The definition of labor dispute in the National Labor Relations Act is identical with the definition of labor dispute in the Norris-LaGuardia Act, except that the latter Act does not include the word `tenure' and uses the conjunction phrase, `whether or not', instead of the more simple `whether.' It follows, therefore, that if the facts of a case constitute a labor dispute within the meaning of the Norris-LaGuardia Act, they also constitute a labor dispute within the meaning of the National Labor Relations Act. * * *" Cert. den. 366 U.S. 905, 81 S.Ct. 1047 and rehear. den. 366 U.S. 941, 81 S.Ct. 1658.
In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), an association of negroes, New Negro Alliance, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises, requested a grocery company, Sanitary Grocery Co., to adopt a policy of employing negro clerks in certain of its stores in the course of personnel changes. Sanitary Grocery denied the request and New Negro Alliance caused one person to patrol in front of one of Sanitary's stores carrying a sign stating: "Do Your Part! Buy Where You Can Work! No Negroes Employed Here!" The picket did not coerce or intimidate Sanitary's customers, did not physically obstruct, interfere with, or harass persons desiring to enter the store, the picket acted in an orderly manner, and his conduct did not cause crowds to gather in front of the store.
The Supreme Court held that there was a "labor dispute" under the Norris-LaGuardia Act and that the federal district court did not have jurisdiction to issue an injunction.
In a recent case, Potomac Elec. Power Co. v. Washington Chap. of Congress of Racial Equality, 210 F.Supp. 418 (D.C. D.C.1962), involving the Washington Chapter of the Congress of Racial Equality, Judge Holtzoff was of the opinion that CORE's demand on an employer did not constitute a "labor dispute".
In the Potomac case, supra, CORE requested that qualified members of the colored race be employed as linemen and meter readers. Thereafter, CORE announced that to achieve this end it would distribute to the Potomac's customers several thousand stamps or pasters stating "We believe in merit hiring". The customers of Potomac were requested to affix the stamps to the stubs of Potomac's bills when the stubs were returned to Potomac. Potomac alleged that it would sustain substantial and irreparable injury if the stamps were put on the stubs, because the stubs are put into computing or calculating machines and if the stamps are on the stubs, it would be impossible to feed the stubs into the calculating machines.
Judge Holtzoff at page 420 in the Potomac case, supra, gave the following reasons why there was not a labor dispute:
"* * * Obviously, in this instance there is no labor dispute in *837 the ordinary sense of that term: there is no dissension between employer and his employees; there is no disagreement between an employer and a labor organization; and there is no controversy between an employer and applicants for employment or an organization of applicants. The defendant organization does not purport to include applicants for employment in its membership, nor does it profess to be their authorized representative. It interjects itself as an interloper. It is urged, however, that the situation presents a labor dispute within the meaning of the Norris-LaGuardia Act, as construed in New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012. In that case an association of negroes in an effort to persuade a grocery company to employ colored clerks, organized a group of pickets, who patrolled in front of one of the defendant's stores and carried placards urging prospective customers not to patronize the store because no negroes were employed there. The Supreme Court held that this situation constituted a labor dispute within the meaning of the Norris-LaGuardia Act. The case is distinguishable on its facts, in that the activities of which the company complained consisted of peaceful picketing in front of the store, instead of far-reaching consequential injuries such as are confronted in the case at bar. As Mr. Justice Roberts pointed out (p. 559, 58 S.Ct. 706):
"`The patrolling did not coerce or intimidate respondent's customers; did not physically obstruct, interfere with, or harass persons desiring to enter the store, the picket acted in an orderly manner, and his conduct did not cause crowds to gather in front of the store.'
"The objectionable activities in the instant case are of an entirely different character and cannot be said to be a legitimate concomitant of any labor dispute, even if this term can be stretched in the far-fetched manner urged by counsel for the defendants."
This Court is of the opinion that the facts of this case are very similar to the Potomac case and that there was not a labor dispute in this case for the same reasons Judge Holtzoff stated in the Potomac case.
In the Potomac case, Judge Holtzoff decided the case as though there was a labor dispute, because Potomac, by showing that substantial and irreparable injury would be sustained by it if an injunction was not granted, came within 29 U.S.C. § 107 of the Norris-LaGuardia Act, which permits the federal district courts to issue injunction under the above circumstance. If this case was controlled by the Norris-LaGuardia Act, the acts of the petitioners would come within 29 U.S.C. § 107.
It must be remembered that 29 U.S.C. § 101 of the Norris-LaGuardia Act, which prevents courts of the United States from issuing restraining orders growing out of a labor dispute, does not apply to state courts. 29 U.S.C. § 113 (d), states:
"(d) The term `court of the United States' means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia."
Also see McCarroll v. Los Angeles County Dist. Coun. of Carpenters, 49 Cal. 2d 45, 315 P.2d 322 (1957), cert. den. 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958).
The question of whether the St. Louis Circuit Court had jurisdiction to issue a temporary restraining order can be determined without deciding whether a labor dispute existed. As stated above, the St. Louis Circuit Court had jurisdiction to issue a temporary restraining order under the Norris-LaGuardia Act even though a labor dispute existed. *838 That brings us to the National Labor Relations Management Act.
The petitioners claim that there was a labor dispute involving an unfair labor practice under 29 U.S.C.A. § 157 and, therefore, the state court did not have jurisdiction because this is within the preempted field of the federal government.
Without deciding whether a labor dispute existed, it can be determined that an unfair labor practice did not exist. It can readily be seen that the act the petitioners contend is an unfair labor practice is the alleged discriminatory hiring policy of the Jefferson Bank and Trust Company. More particularly, the Bank's refusal to hire four negroes.
The question is whether the Bank's refusal to hire four negroes constitutes an unfair labor practice under the National Labor Relations Management Act. The answer is no. The Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, at 45, 57 S.Ct. 615, at 628, 81 L.Ed. 893 said:
"* * * The act [National Labor Relations Act] does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."
In Associated Press v. National Labor Relations Board, 301 U.S. 103, at 132, 57 S.Ct. 650, at 655, 81 L.Ed. 953, the Supreme Court said:
"The act [National Labor Relations Act] does not compel the petitioner to employ anyone; * * *."
At page 129, 57 S.Ct. at page 654, the Supreme Court said:
"The National Labor Relations Act seeks to protect the employees' right of collective bargaining and prohibits acts of the employer discriminating against employees for union activities and advocacy of such bargaining by denominating them unfair practices to be abated in accordance with the terms of the act."
The Eighth Circuit Court of Appeals in Farmers Co-Operative Co. v. National Labor Relations Board, 208 F.2d 296, at page 303 (1953), said:
"* * * An employer may hire and discharge at will, so long as the action is not based on opposition to union activities."
The state court had jurisdiction to issue a temporary restraining order prohibiting sit-ins, lie-ins and stand-ins, which would disrupt and interfere with Jefferson Bank and Trust Company's business, under Civil Rule 92, V.A.M.S. The fact that the Jefferson Bank and Trust Company did not comply with CORE's demand to hire four negro employees was not an unfair labor practice under 29 U.S.C.A. § 157, which the federal government has preempted.
The petitioners claim that the Court by issuing the temporary restraining order violated the Fourteenth Amendment of the United States Constitution. The reason given is that due to the alleged history of Jefferson Bank and Trust Company's discriminatory hiring policy, the state court could not issue a restraining order prohibiting sit-ins, lie-ins and stand-ins, which were for the purpose of forcing the Bank to hire four negroes, because the restraining order furthered the Bank's discriminatory hiring policies. This Court does not go along with this argument. The petitioners were not protesting the Bank's discriminatory hiring policy, but were trying to force the Bank to hire four negroes which is a discriminatory practice. Section 296.020, V.A.M.S., defines *839 what are unlawful employment practices in the State of Missouri:
"It shall be an unlawful employment practice: (1) For an employer, because of the race, creed, color, religion, national origin, or ancestry of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."
The Supreme Court in Hughes v. Superior Court of State of California in and for Contra Costa County, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), said the Fourteenth Amendment of the Constitution does not bar a state from using injunctions to prohibit picketing of a place of business solely in order to secure compliance with a demand that its employees be in proportion to the racial origin of its then customers. At page 466, 70 S.Ct. at page 722 the Supreme Court said:
"* * * We cannot construe the Due Process Clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy. * * *"

HEARING
Were the petitioners afforded a hearing which meets the due process requirement of the Fourteenth Amendment in criminal contempt cases?
The Supreme Court of the United States in In re Oliver, 333 U.S. 257, l. c. 275, 68 S.Ct. 499, l. c. 508, 92 L.Ed. 682 (1948) states that the following test is to determine if procedural due process was granted in criminal contempt cases where the misconduct was not in open court:
"* * * requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation."
The Missouri Supreme Court through Missouri Rules of Criminal Procedure, has set up a procedure for criminal contempt committed out of the presence of the court in Rule 35.01(b).
"* * * The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the prosecuting attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to admission to bail as provided in these Rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a finding of guilt the court shall enter an order reciting the essential facts constituting the criminal contempt and fixing the punishment."
Rule 35, Missouri Rules of Criminal Procedure is almost identical to Federal Rule of Criminal Procedure 42.
The first question for this Court to determine in order to decide whether the petitioners obtained a hearing which meets the due process requirement under the Fourteenth Amendment is: Did the petitioners have notice that they were charged with criminal contempt?
Notice was given the petitioners, on October 4, 1963, on the hearing on petitioners' attachment process, the following is the pertinent language of the notice:
"Thereupon the hearing on said attachment progresses before the Court and being terminated the same *840 is submitted to the Court upon the oral pleading, the evidence and proof adduced and the Court having heard and duly considered the same and being sufficiently advised thereof doth find that said alleged contemnors have been duly represented by counsel and having failed to disprove or purge themselves of said contempt by physically hindering and preventing customers of the plaintiff and other members of the public from customary access to tellers' windows and by locking arms in front of the tellers' windows in plaintiff's place of business, or sitting in, lying in or standing in or singing in plaintiff's place of business, thereby interfering with the plaintiff's business or by harassing plaintiff's employees or customers in front of, around or at plaintiff's place of business, * * *."
"It is further ordered by the court that said alleged contemnors be and appear in this court and in Division Number 2 thereof on Monday, October 7th, 1963 at 10 o'clock a. m., and there and then to show cause, if any, why they should not be punished for contempt of court in violation of the Court's restraining order heretofore issued the 30th day of August, 1963." (Tr. p. 71)
The term "criminal contempt" was not used in the notice. Under Mo.R.Cr.P., 35.01(b), the contempt is to be described as criminal contempt. As stated earlier, F.R.Cr.P. 42(b) is very similar and on the above point it is identical.
The part of the show cause order that gives notice that the petitioners would be tried for criminal contempt is the use of the following language:
"* * * to show cause, if any, why they should not be punished for contempt of court in violation of the court's restraining order * * *." (Emphasis added.)
The Supreme Court in the United States v. United Mine Workers, 330 U. S. 258, at page 297, 67 S.Ct. 677, at page 698 (1947), said that the use of the word "punished" could be argued to give adequate notice that the contempt proceeding would be criminal instead of civil. The Supreme Court in footnote 64 cites the Columbia Law Review for authority and Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1941), but correct date is (1911), saying that the word "punished" can be ambiguous in contempt cases.
This Court is of the opinion that the show cause order given by the Circuit Court of St. Louis stating that the petitioners would be "punished for contempt of court" unless they could disprove or purge the contempt was enough to give the petitioners notice that they would be tried for criminal contempt under the due process requirement laid down in In re Oliver, supra, Mo.R.Cr.P. 35.01(b) and F.R.Cr.P. 42(b), because the restraining order forbids an act.
If the restraining order had commanded the petitioners to do an affirmative act and they refused to do the affirmative act, then using the word "punished" in the show cause order would be ambiguous, because this could mean that the petitioners would be put in jail until they performed the act, or it could have meant that the petitioners would be punished for criminal contempt.
The restraining order involved in this case is the prohibitive type of restraining order prohibiting the petitioners from demonstrating, etc., at the Jefferson Bank and Trust Company. Therefore, when the word "punished" was used in the show cause order, it meant only one thing, that the petitioners would be punished for criminal contempt. In other words, if they were found to have committed the acts which were prohibited by the restraining order, their punishment would not be remedial, but it would be punitive to vindicate the authority of the court.
In Gompers v. Buck's Stove & Range Co., supra, the Buck's Stove & Range Company in its petition made two prayers after stating the acts which violated the restraining order. The first prayer is *841 almost identical to the notice given by the Circuit Court of the City of St. Louis at the attachment hearing: "(1) that the defendants show cause why they should not be adjudged in contempt of court and be punished for the same; and (2) that petitioner may have such other and further relief as the nature of its case may require." The second prayer in the Gompers case is not present in this case and it is that prayer which the Supreme Court said caused the ambiguity in that case.
Once it is found that the petitioners had sufficient notice under Rule 35.01(b), the fact that in the argument for the motion to dismiss the petitioners' attorneys asked if the court was trying them for civil or criminal contempt is irrelevant.
The petitioners also complain that they were not advised of the time the demonstrations took place. They were so advised. The motion to attach the petitioners contained the date; and at the hearing on the attachment, at which all of the petitioners were present, the witnesses, who testified that the petitioners committed the acts which were prohibited by the restraining order, stated the date of the said acts.
The petitioners were told Friday night, October 4, 1963, that they were to show cause, if any, why they should not be punished for contempt on Monday, October 7, 1963, at 10:00 a. m. At that time the hearing was continued until 2:00 p. m. while petitioners sought a writ of prohibition, which was denied. Two days to prepare for a hearing to disprove or purge contempt of court seems to be a reasonable amount of time to this Court. See United States v. Barnett, 376 U.S. 681, at page 686, 84 S. Ct. 984, 12 L.Ed.2d 23 (1964), where a show cause order was issued on September 26th to show cause on September 29th.
It is also clear from the record that the petitioners were represented by counsel and had a chance to testify and call other witnesses.
The United States Supreme Court on December 14, 1964, in the case of Hamm v. City of Rock Hill, 85 S.Ct. 384, held that the Civil Rights Act of 1964 applies retroactively to certain sit-ins arising out of violations of the Civil Rights Act of 1964. However, this decision has no bearing on the instant case for the reason that the Civil Rights Act itself is not applicable to the instant situation. Section 703(j) of the 1964 Civil Rights Act provides:
"(j) Nothing contained in this title shall be interpreted to require any employer, * * * to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, * * * in comparison with the total number or percentage of persons of such race, color, religion, sex or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."
This section is very similar to the Missouri Statute previously quoted.
As previously pointed out in this memorandum, when a court has jurisdiction over the person and the subject matter and issues a restraining order, the parties must obey the restraining order until it is reversed by orderly and proper proceedings. If they do not obey the restraining order, they can be punished for criminal contempt.

CONCLUSION
In brief, the record clearly shows that the Circuit Court of the City of St. Louis had jurisdiction of the subject matter and the parties. A restraining order was issued by that court. The petitioners had actual knowledge of the restraining order. They willfully and deliberately violated the restraining order.
*842 Basically, we are confronted with a situation where we must consider the problem of upholding court orders to preserve their integrity and effectiveness as opposed to any procedural defects that may exist. The balance weighs heavily in favor of upholding the orders of the state court, since we have already determined that the procedural defects do not amount to a deprivation of petitioners' constitutional rights.
Accordingly, the writs sought by petitioners will be denied. No further order will be made concerning bail pending further order of this Court or the Court of Appeals for the Eighth Circuit.