**BROADWAY MOTORS FORD, INC.,**
d/b/a Broadway Motors Ford,
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 18919.

United States Court of Appeals
Eighth Circuit.

June 7, 1968.

Clifton L. Elliott, of Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioner, Harry L. Browne, Kansas City, Mo., on the brief.

Richard Thesing, Atty., National Labor Relations Board, for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Wayne S. Bishop, Atty., N.L.R.B., on the brief.

Before VOGEL, Senior Circuit Judge, LAY, Circuit Judge, and BECKER, Chief District Judge.

VOGEL, Senior Circuit Judge.

Broadway Motors Ford, Inc., hereinafter referred to as the employer or petitioner, seeks to have this court review and set aside an order of the National Labor Relations Board issued June 23, 1967, pursuant to § 10(c) of the Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq. The National Labor Relations Board, hereinafter referred to as the Board or respondent, has cross-petitioned for enforcement of its proposed orders. The Board's decision is reported at 165 N.L.R.B. No. 106. The practices complained of occurred in Kansas City, Missouri, within the jurisdictional limits of this Circuit. Jurisdiction is noted under § 10(e) and (f) of the Act.

The Board found the employer had engaged in unlawful conduct violating § 8(a) (1) through interrogation of its employees concerning unionization and that it had discriminatorily discharged employee Edmund C. Baker and refused to reinstate him, thereby discouraging

membership in the union and violating § 8(a) (3) and (1) of the Act. It ordered the posting of appropriate notices, directed that the employer cease and desist from engaging in the unfair labor practices found, and to offer Baker reinstatement with back pay.

We find the Board's conclusions and its proposed orders to be unsupported in the record by any substantial evidence and we accordingly deny enforcement.

The employer is and was at all times involved herein engaged in selling and servicing new and used automobiles in Kansas City, Missouri. This proceeding involves the hiring and subsequently the discharge of but one employee, the said Edmund C. Baker. Baker was hired as a new car salesman on June 15, 1966. On July 5, 1966, some three weeks after Baker had been employed, Robert Keith was hired as the new car sales manager.

A careful examination of the entire record, including the testimony of each witness, indicates that it is filled with incidents indicating the undesirability of Baker's retention as a salesman dealing with the public in the employer's showrooms and substantial reasons for his discharge. His chronic complaints, his continuous carping, his negative attitude and his loud profanity in front of customers, all of which was testified to by a number of witnesses, and some of which he himself conceded, seems to us ample reason for his discharge some time before it came about. Within three weeks after he had been hired as new car sales manager, Keith had concluded that Baker would not make the type of salesman he hoped to develop and made up his mind to terminate him. He was, however, reluctant to discharge a man when he, himself, had been there only three weeks. He reprimanded and warned Baker, telling him his attitude toward his employer and the other salesmen had to improve. Toward the latter part of July Keith spoke to Larry Nye, vice president and general manager, about his dissatisfaction with Baker and his decision to discharge him. He did not discharge him at that time because he did not have a re-

placement for him and also because Baker had several deals on new cars which were not yet closed. Baker continued his attitude, additionally complaining about cars not being serviced properly, the fact that the salesmen had to "shag", that is, move cars from the storage lot to the dealership and service departments, work that was customarily done by service employees who were at the time out on strike. In three separate meetings in August, Keith counseled Baker on his attitude and sales approach. Baker's attitude persisted. Continuously he used profanity and four-letter vulgarities in a loud voice so that he was heard everywhere in the showroom. At one time he became angry at one of the women in the office when he found that he had to return to someone to whom he had sold a car and get the papers properly executed. He descended into the use of four-letter vulgarities to her, repeating them after she had protested, and this in front of and within the hearing of customers.

In one instance the vice president of the bank which handled all the finance paper for the employer was in the showroom. Baker had been disgruntled because a finance deal offered by him had been refused by the bank. In a loud voice heard throughout the showroom by the bank vice president and others, Baker announced, "If you ever want to borrow any money, don't go to the chicken shit bank down at Twelfth and Grand, at Traders." Baker followed this with another derogatory remark. The banker complained to Mr. Neumeier, credit manager of the company, and eventually a report of the incident reached Nye, who talked to Keith. Keith investigated and reported back to Nye that as soon as a replacement for Baker could be found Baker would be released. Nye agreed because, as he said, they could not tolerate that sort of thing going on in the showroom. This incident occurred only thirteen days prior to Baker's discharge and came to the attention of Keith and Nye only one week prior to the discharge.

Baker's attitude toward morning sales meetings was most uncooperative. While

he attended them, he termed them "a waste of time" or "bull sessions". He interrupted them with sarcastic remarks, saying at the opening of a meeting, "Let's get this thing over with and get out of here, it is a waste of time."

On Monday morning, August 29th, as was customary while the service employees were out on strike, the salesmen, office help and even management got together and cleaned up the premises. Keith told Baker to get the mops and start mopping one end of the floor. Baker refused and said, "I am not about to mop any floor." That same day Keith was able to employ a graduate from an automobile sales training school. He spoke to Mr. Nye, telling him that he had found a replacement for Baker and was going to let Baker go. Nye told him that he, Keith, was responsible for hiring and firing of salesmen and if that was what he wanted to do that was all right with him.

On Sunday, August 28th, the United Auto Workers (UAW), AFL-CIO, held a general informational meeting for automobile salesmen in the Greater Kansas City area. Baker attended this meeting. As he put it:

> "I was told there was going to be a meeting on a given Sunday, and I talked to the salesmen before this Sunday and asked them if anyone would be interested I'd go and see what it was all about.
>
> "TRIAL EXAMINER: When was this?
>
> "THE WITNESS: 28th of August was the meeting, but it was around the 26th or 27th that I was talking to the men at Broadway to see if they were interested, and quite a few said yes, they were, so I attended the meeting to see what it was all about and see if they could do anything for us."

The following Monday morning at the sales meeting Nye, the general manager, asked if anyone had attended the union informational meeting. Baker said he had, " * * * that there weren't too many there, and they asked the salesmen to pass out cards."

> "TRIAL EXAMINER: Was that all you told him?
>
> "THE WITNESS: Yes, sir. I did not tell him that I agreed to pass out cards."

Later in Keith's office Keith asked Baker what he thought the union could do for him. Baker replied:

> "I said I didn't know if the salesmen needed a union or not, but they needed some kind of organization. They needed guaranteed income and some way to hold up the gross income on the cars because the dealers weren't making money and salesmen wanted shorter hours, make the people come in at more concentrated times."

On Tuesday morning, August 30, 1966, Keith called Baker into his office after the sales meeting and told him he was going to have to let him go. He was told that he would be paid for the cars that he had on order and that he could resign if he wished and receive a job recommendation. Baker refused, saying, "I felt that I didn't want to resign so I let him fire me."

It is on this record that the Board, adopting the Trial Examiner's findings and conclusions, found that the company coercively interrogated Baker about his union activities, in violation of § 8(a) (1) of the Act and discharged him because of his union adherence, in violation of § 8(a) (3) and (1) of the Act.

▆ The evidence in support of the coercive interrogation finding is not substantial. We are unable to conclude that the general question asked by Mr. Nye during the morning "coffee clutch" with several of the salesmen constituted an incident of coercive interrogation. See Beaver Valley Canning Co. v. N. L. R. B., 8 Cir., 1964, 332 F.2d 429, 433; N. L. R. B. v. Twin Table & Furniture Co., 8 Cir., 1962, 308 F.2d 686 (for the facts of this case, see 133 N.L.R.B. 1113 at 1114). Neither do we feel that the single inquiry by Mr. Keith during the afternoon conversation with Baker constituted an un-

lawful interrogation. Baker conceded that this was a long conversation and that even after the question he "got a lot of things off [his] mind". Even assuming that this was, however, an incident of interrogation, we do not believe it violates the proscription of the Act. While there are cases holding a single incident of interrogation sufficient to support a § 8(a)(1) violation, this holding has been supported by a background of union hostility by the company. N. L. R. B. v. Lexington Chair Co., 4 Cir., 1966, 361 F.2d 283, 290; N. L. R. B. v. Griggs Equipment, Inc., 5 Cir., 1962, 307 F.2d 275, 278. Where there is no background of union hostility we do not believe that a single question asked of a single employee constitutes sufficient evidence to justify a finding of coercive interrogation. N. L. R. B. v. O. A. Fuller Super Markets, Inc., 5 Cir., 1967, 374 F.2d 197, 203; Banner Biscuit Co. v. N. L. R. B., 8 Cir., 1966, 356 F.2d 765, 768–770; N. L. R. B. v. Ritchie Mfg. Co., 8 Cir., 1965, 354 F.2d 90, 99. Such anti-union animus is absent here.[1]

An examination and re-examination of this record leave us at an absolute loss to find therein justification for the Board's conclusions and orders. The single thing the Examiner and the Board can point to is the coincidence of timing; that is, the discharge of Baker on Tuesday, August 30th, following the sales meeting of Monday, August 29th, at which, in response to a question from Mr. Nye, Baker stated that he had attended an information meeting the preceding Sunday. Overlooked completely is the well-substantiated fact that Baker was an unsatisfactory employee marked for discharge a long time before there had been a mention of a union information meeting. Overlooked completely is the fact that there have been established no threats, no innuendos, no coercion of any kind, no promises of reward, and also overlooked is the fact that on Monday,

August 29th, Baker gave good and substantial additional reasons for his discharge. Overlooked also is the fact that on that date Keith was able to hire a replacement. The only thing left in the record is that of timing.

 The Board has the burden of establishing the § 8(a)(3) violation. N. L. R. B. v. O. A. Fuller Super Markets, Inc., supra, 374 F.2d at 200; Banner Biscuit Co. v. N. L. R. B., supra, 356 F.2d at 770. Here the Board has failed to carry that burden. It is well established that the mere coincidence of an employee's union activity and the employee's discharge will not support a charge of discrimination. Beaver Valley Canning Co. v. N. L. R. B., supra, 332 F.2d at 433; Macy's Missouri-Kansas Division v. N. L. R. B., 8 Cir., 1968, 389 F.2d 835, 840, 841. As we said in DC International, Inc. v. N. L. R. B., 8 Cir., 1967, 385 F.2d 215, 220:

"* * * Obnoxious conduct on the employee's part cannot insulate him from a legal discharge by the company, and where a proper motive for the discharge can as reasonably be inferred as an improper motive, the discharge should not be set aside by the Board where the more substantial evidence supports the proper motive. N. L. R. B. v. Ace Comb Co., supra [8 Cir., 342 F.2d 841]; Fort Smith Broadcasting Co. v. N. L. R. B., 8 Cir., 1965, 341 F.2d 874; N. L. R. B. v. Fox Manufacturing Co., 5 Cir., 1956, 238 F.2d 211, 215."

In a very recent case, N. L. R. B. v. Bangor Plastics, Inc., decided April 11, 1968, 392 F.2d 772, the Court of Appeals for the Sixth Circuit, on facts quite similar to those with which we are here concerned, disagreed with the Board and held that an employer did not violate the Act by discharging an employee for using vulgar and abusive language in addressing a foreman. The Board had found

---

1. In fact the record suggests a history of peaceful union development with this company. Thus while salesman Al Hines had signed a union card and participated in union activities, he has not been interrogated or fired. Neither were the successful union organizers of this company's service department intimidated in any way.

that the foreman's report that precipitated the discharge was attributable to the foreman's prior anti-union activity rather than to a reasonable and justifiable reaction to the employee's abusive statements. The Court of Appeals there found that the employer acted in good faith reliance on the foreman's report of the incident and denied enforcement of the Board's order. In the instant case there is no prior record or contention of anti-union animus on Keith's part so that no substantial evidence suggests that the employer acted in less than good faith in following Keith's recommendation to fire Baker because of Baker's poor attitude.

Enforcement denied.