**ILLINOIS RUAN TRANSPORT CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 19057.**

United States Court of Appeals Eighth Circuit.

Nov. 26, 1968.

Rehearing Denied Dec. 31, 1968 En Banc.

Rehearing Denied Jan. 6, 1969.

Lay, Circuit Judge, dissented.

J. Leonard Schermer, of Shifrin, Treiman, Schermer & Susman, St. Louis, Mo., for petitioner; Thadeus F. Niemira, St. Louis, Mo., on brief.

Paul J. Spielberg, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Joseph C. Thackery, Atty., N.L.R.B., on brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and LAY, Circuit Judges.

VAN OOSTERHOUT, Chief Judge.

This case is before us upon the petition of Illinois Ruan Transport Corporation (Ruan) for a review of an order of the National Labor Relations Board issued against Ruan on June 9, 1967, reported at 165 NLRB No. 34. The Board has cross-petitioned for the enforcement of its order. It is agreed and established that Ruan is engaged in commerce within the meaning of the Act and that the court has jurisdiction under § 10(e) and (f) of the Act (National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq.)

The Board, in agreement with its Trial Examiner, found Ruan had violated § 8 (a) (1) of the Act by discriminatorily discharging its employee Adams for engaging in concerted protected activities in the implementation of the driver safety provisions of the collective bargaining agreement between the company and Teamsters Local No. 525, the collective bargaining agent of the employees. The Board ordered Ruan to cease its unfair labor practices, to restore Adams to his job with back pay, and to post notices.

The basic issue presented is whether there is substantial evidence in the record as a whole to support the Board's finding that Adams' discharge was motivated by Adams' protected union activity. A careful examination of the record as a whole convinces us that the Board's determination that Adams was discriminatorily discharged lacks substantial evidentiary support.

Initially, a serious question arose as to whether Adams' alleged safety campaign was a protected concerted activity. See Indiana Gear Works v. N.L.R.B., 7 Cir., 371 F.2d 273, and cases there cited. Adams was one of forty tank truck-trailer drivers employed by Ruan. A letter written by Adams to Ruan's president on April 1, 1966, contains many gripes by Adams with respect to company practices and makes numerous suggestions. At least many of these could not fall in the protected activity category. The record is barren of any evidence that any of Adams' complaints or suggestions had any support from any fellow-employees or the union. Adams' good faith in his alleged safety campaign is open to serious question. However, inasmuch as we hold hereinafter that the discharge was not motivated by the safety campaign, we see no purpose in adjudicating the close and difficult question of whether Adams' alleged safety campaign constituted protected concerted activity and will assume for the purposes of this case, without so deciding, that the activity is protected activity.

Adams was discharged on April 21, 1966. He was orally advised of the

reasons for his discharge on that date, and at his request a letter bearing the same date was sent to him and received by him the following day. The letter reads:

"Dear Bob:

This letter confirms our conversation and is, after complete investigation, issued as notice of discharge for violation of Section 3(e) and Section 2(c) of Uniform Rules and Regulations Governing Employees of Tank Truck Carriers Signatory to the Central Conference of Teamsters Tank Truck Agreement for dishonesty in falsification of records and unauthorized use of our motor vehicle.

On April 13th, 1966 you took it upon yourself to move our transport #8792–2165 from Standard Oil Company plant at 4017 Park Avenue, St. Louis to 16th & Clark Streets, St. Louis, Missouri where you had arranged for an I.C.C. equipment compliance check —a strictly unauthorized movement of our equipment.

When you arrived back at our terminal after a delay of nearly two hours you advised our dispatcher that you were delayed behind another truck —subsequently, you made out your J–61 operational report which stated that you were delayed at Standard Oil Plant because an American Oil Company truck with a defective pump was unloading ahead of you.

Our investigation with the American Oil Company plant superintendent develops that the above statement of yours is incorrect.

In addition to the above you were given four warning notices since November 2, 1965 for the following violations:

On November 2, 1965 you were given a warning letter because of running a railroad crossing—Section 5(e). On December 3, 1965 you received a warning notice for failure to properly load your transport, in violation of Section 3(g). On January 28, 1966 you were given a warning notice on accidents you had on January 25, 1966 and on January 28, 1966—Section 1 (b). On February 9, 1966 you received a warning letter for violation of I.C.C. hours—Section 3(g).

Discharge is effective on April 21st, 1966."

Ruan bases Adams' discharge primarily upon the unauthorized movement of its motor vehicle on April 13, 1966, at St. Louis. On that date, Adams was sent from the company base at Wood River, Illinois, to make an oil delivery to a Standard Oil plant at 4017 Park Avenue in St. Louis. Without authorization from Ruan, Adams called the I.C.C. inspection office and at his request and without a demand from the inspector, he arranged for a safety inspection of his equipment. After unloading, pursuant to such arrangement, he drove his equipment to the I.C.C. location at 16th and Clark Streets in St. Louis.

The union and employer had entered into an agreement covering rules and regulations pertaining to drivers and with respect to penalties that could be imposed for rule violations. Section 2 (c) of the rules prohibits drivers from making unauthorized use of motor vehicles and provides for a penalty upon violation of layoff or discharge. Grievance procedures are spelled out in the contract in detail.

It clearly appears that the company and union by their negotiated contract agreed that unauthorized use of equipment was a breach of duty which would justify a discharge. The existence and validity of the rule is not challenged. It is established beyond dispute that Adams violated the unauthorized use rule. The National Labor Relations Board in its brief states:

"Although the ICC inspection involved a literal violation of a Company rule— since Adams had to drive the truck about a mile off route—this conduct cost the Company only a hour's use of its property, while it brought to light a number of defects affecting the safe operation of the truck."

Thus, it is firmly established that a valid basis existed under the labor contract for Adams' discharge.

The issue of whether there is substantial evidence in the record when considered as a whole to support the Board's finding has been frequently considered by the courts, including this court. The leading case of Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, lays down the guide lines for review on this issue. Among other things, the Court there states:

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. 474, 490, 71 S.Ct. 456, 466.

■ Each case must be determined upon the basis of its own peculiar facts. The applicable principles have been cited and thoroughly discussed in our many prior cases dealing with the review of Board orders determining that discriminatory discharges were made. In a considerable number of cases, we have determined that the Board's finding of discriminatory discharge lacked sub-

stantial evidentiary support. Among such cases are, Singer Co., Wood Products Div. v. N. L. R. B., 8 Cir., 371 F.2d 623; Farmbest, Inc. v. N. L. R. B., 8 Cir., 370 F.2d 1015; N. L. R. B. v. Monroe Auto Equip. Co., 8 Cir., 368 F.2d 975; Banner Biscuit Co. v. N. L. R. B., 8 Cir., 356 F.2d 765; N. L. R. B. v. South Rambler Co., 8 Cir., 324 F.2d 447; Osceola County Co-op. Creamery Ass'n v. N. L. R. B., 8 Cir., 251 F.2d 62.

■ It is established by the authorities last cited that an employer has a right to hire and discharge employees at will, provided motivation for the discharge is not punishment for legitimate protected concerted activity. When, as here, the contract provides the basis upon which a discharge may be made, the contractual provisions constitute a further qualification upon the right to discharge. Where the discharge is upon a ground specifically authorized by the contract, the employer has the same absolute right to discharge as he would have had in the absence of contractual limitations upon discharge. When the contractual provisions for discharge are met, the right to discharge exists provided the discharge is not motivated by activity protected by the Act. We have no doubt that Ruan had a right to discharge Adams for the unauthorized use of its motor vehicle. Protected activity under the circumstances of this case cannot extend to an unauthorized use of the employer's equipment in violation of the governing contract. The rule proscribing unauthorized use of company vehicles is in no sense unreasonable. Unauthorized use of vehicles, as the contract recognizes, can cause a serious disruption in the company's business operations.

■ We now reach the issue of whether there is any substantial evidence to establish that the discharge was motivated by protected union activity. It is of course true that a justifiable ground of discharge is not a defense to an unfair labor practice charge when the asserted ground for discharge is a mere pretext and not the moving cause of a discharge. The burden of proving an

unlawful discharge is upon the Board. An inference that the discharge of an employee was motivated by his union activity must be based on evidence, direct or circumstantial, and not upon mere suspicion. N. L. R. B. v. Monroe Auto Equip. Co., supra; N. L. R. B. v. South Rambler Co., supra. The discharge letter, in addition to basing the discharge on the unauthorized use of the motor vehicle, states that Adams made a dishonest report and that he had since November 5, 1965, been given four described warning letters for safety violations. None of the asserted complaints against Adams in the letter could possibly fall in the category of protected activity. It is quite true that under the union contract the safety violations standing alone do not warrant a discharge. Nevertheless, such violations present matters which employers may reasonably consider when a violation occurs which warrants a discharge.

The Examiner in his findings points to no substantial evidentiary basis for holding the discharge was discriminatory, nor do we find any substantial evidentiary basis therefor in the record.

The Examiner cites at length cases holding that it is against public policy to deny an employee the right to make complaints to public authorities with respect to conduct of his employer that violates safety regulations and infers that the discharge was by reason of complaints made to authorities by Adams. The record shows that Ruan has recognized at all times here material the right of an employee to make such complaints. Adams, in his letter of April 1, 1966, to the president of Ruan includes a statement that he has sent defective equipment reports to the I.C.C. with the request for investigation. The record further shows that in February, 1966, Ruan was aware of the fact that Adams had complained to the highway police that Ruan's vehicles were being overloaded and had obtained some assurance that such violations would be checked. No discharge followed as a result of such activities. The contract between the company and the union specifically gives any employee a right to refuse to drive equipment he considers unsafe.

The equipment defects claimed by Adams under his own testimony existed at the time he took out the equipment and he made no complaint with respect thereto. The I.C.C. examiner found some defects in the equipment but none which would require taking the truck off the road. After Adams returned to his base, subsequent to the inspection, he made no immediate report with respect to the defects and continued to use the equipment in making deliveries for the balance of the day. The inspection report was not turned in until the end of the day's work.

The fact that Adams had on some prior occasions been layed off for the day when he refused to operate equipment he considered defective in no way justifies his right to make an unauthorized use of the equipment in taking it off the route for an inspection which was neither authorized by his employer nor demanded by the regulating agency. If Adams' complaint about prior layoffs resulting from equipment complaints has any merit, the company might well be guilty of an unfair labor practice in laying him off for the day if other equipment was available for assignment to him. Such a charge is not here before us.

Two fellow employees testified at the hearing that they had on a few occasions stopped while on duty for a haircut, to pick up license plates and to pick up other items for their personal use, and that they were not discharged. Such drivers admitted that they did not log or report such stops to the company and there is no evidence that the employer had any knowledge of the infractions. On the basis of this evidence, the Examiner finds:

"The Respondent's defense that Adams violated one of its rules by his unauthorized use of the vehicles is not tenable. As shown hereinabove, Adams' departure or deviation from his route of delivery amounted only to

500 or 600 feet. Moreover, the record is replete with evidence that other drivers had departed from their routes of delivery for a number of personal reasons, including the obtaining of license plates at Springfield, Illinois, and visits to barber shops for haircuts. Although the record does not show that the Respondent had definite knowledge of such unauthorized use of its vehicles, it is clear that such unauthorized use extended over a period of several years and, in at least one instance, was for the benefit of the Respondent's office secretary at the Wood River terminal. I infer that because of such extended unauthorized use of Respondent's vehicles and the long period of time over which such unauthorized use occurred that the Respondent, in fact, had knowledge. I therefore find and conclude that the Respondent's defense that Adams was terminated because of his unauthorized use of the vehicles in question on April 13, is lacking in merit."

In our view, the above findings are based entirely upon conjecture and speculation and not substantial evidence. The violations related are not similar to that of Adams and there is nothing to show that the work records of the involved employees are in any respect the same. In any event, when a violation warranting a discharge exists, a discretion exists in the employer whether or not to exercise the right to discharge, and the work record of an employee may well be an important consideration in determining whether the discharge should be made.

In our present case, unlike the situations in many of the decided cases, there is no evidence whatsoever of hostility to the union or union activities. We find no evidentiary basis for an inference that Adams' discharge was motivated in any way by Adams' alleged safety campaign.

Adams immediately after his discharge invoked the grievance procedure provided by the contract. At the hearing at the company level, Adams appeared and was represented by the union secretary and business agent. The violation of the rule was not disputed but it was urged that the penalty was too severe. No solution was reached. The grievance, pursuant to the contract, was presented to a special meeting of the joint committee for arbitration consisting of three outside employers and three outside labor representatives. Adams appeared in person and was represented by three union officials. The case was presented by the union business agent, whereupon Adams spoke for himself and read the letter of complaint he had written Ruan on April 1, 1966. It would appear that he was given a full opportunity for the presentation of any grievance that he might have. The arbitration board unanimously upheld the discharge. The unfair labor charge here invoked was filed shortly after the adverse decision of the arbitration board.

It is Ruan's position that the arbitration procedure was fair and regular and that the Board should have accepted the arbitration board's determination with respect to the discharge. The Examiner, affirmed by the Board, determined that the arbitration hearing did not meet the standards set by the Board in Speilberg Mfg. Co., 112 NLRB 1080. By reason of the provisions of § 10 of the Act, it would appear that the Board is not bound by the decision of an arbitration board in considering an unfair labor practice before it. N. L. R. B. v. Acme Industrial Co., 385 U.S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495; Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320.

The issue of whether the discharge was motivated by protected union activities does not appear to have been raised in the arbitration proceeding and hence the Board did not abuse its discretion in refusing to be bound by the arbitration decision. See Hawkins v. N. L. R. B., 7 Cir., 358 F.2d 281, 284. Consequently, in reaching our result, we have given no consideration to the action of the arbitration board in upholding the discharge.

A careful reading of the entire record has left us with the firm conclusion that there is no substantial evidentiary support for the Board's determination that Adams' discharge was motivated by any activity of Adams which is protected by the Act. No unfair labor practice has been established.

The Board's order is set aside and enforcement is denied.

LAY, Circuit Judge (dissenting).

I respectfully dissent. A brief review of the evidence discloses that Robert E. Adams, an employee of Illinois Ruan Transport Company for 13 years, was discharged, allegedly for violating company rules relating to unauthorized use of property, and for filing a dishonest report. During 1965–66 Adams made several complaints concerning safety procedures and deficiency of tractor-trailer equipment assigned to him for hauling petroleum products on the public highways. On April 12, 1966, he was assigned to drive a tractor-trailer unit which he reported as having bad tires and brakes that pulled to the left and needed adjusting. On the morning of April 13 he again was assigned the same equipment and noted that the tires had not been changed. He accepted the equipment without further protest because it was the company policy that the driver take the equipment assigned or be laid off for that day. During the course of the day's trip from the company terminal at Wood River, Illinois, to St. Louis, Missouri, he drove to the Interstate Commerce Commission inspection bureau in St. Louis and had the truck inspected. The inspection revealed several major deficiencies which related to the safety operation of the vehicle. Adams then returned to his employer's terminal and, as directed by the I.C.C. inspector, submitted the I.C.C. report to his employer. On April 21 the employer discharged Adams.

An unfair practice charge was filed before the National Labor Relations Board alleging a violation of § 8(a) (1) of the Act. The examiner found that the discharge was pretextual and in violation of the employee's § 7 rights. The Board adopted the examiner's findings and ordered reinstatement.

GROUNDS FOR DISCHARGE

After being discharged Adams requested a letter specifying the grounds upon which his employment had been terminated. The letter, dated April 21, 1966, specified the grounds of discharge as (1) unauthorized use of the tractor-trailer equipment, (2) the filing of a dishonest report, and (3) past safety violations. I review these reasons in reverse order.

(1) *Past violations.*

All of these past violations as set forth in the letter were designated "minor" infractions under the contract and required only a "reprimand." The examiner credited the terminal manager's affidavit to the Board which stated that these violations were *"not * * * actually the reasons for the discharge."*

(2) *Dishonest report.*

Adams testified that he was delayed unloading at the Standard Oil Plant because an American Oil truck was unloading in front of him and that he was told it had a defective pump.

Adams, whose testimony the examiner credited,[1] said that the American Oil Company "spotter" told him the truck in front of him had "a leakage." Manager Rose testified they checked with American Oil and they did not know of any truck with a defective pump. However, there was no dispute that Adams was delayed at American Oil Company because another truck was unloading in front of him.

The tachograph from Adams' truck revealed the exact time of the delay at the

---

1. "The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given their testimony' in labor cases is primarily one for determination by the trier of facts. (citations omitted) This Court is not the place where that question can be resolved, unless it is shocking to our conscience." NLRB v. Morrison Cafeteria Co., 311 F.2d 534, 538 (8 Cir. 1963).

Standard Oil Company to be the same as Adams reported. Adams' report as to what he believed was not shown to be false by any credible evidence. He merely related what someone told him. The only evidence the company had of a false report is based solely upon a similar hearsay statement from some official to whom Adams did not talk. *In any event, Mr. Rose, the terminal manager, said that the report by Adams of his delay at the Standard Oil Company in St. Louis would not have been the basis of discharge had he not driven the company's equipment to the I.C.C. without permission.*

(3) *Unauthorized use of the equipment.*

Section 3(g) of the company rules prohibited the unauthorized use of company equipment. The company now agrees that this is the actual basis for Adams' discharge.

The company concedes that Adams could not have been discharged merely for reporting the unsafe equipment to the I.C.C. The route leading from the American Oil Company in St. Louis to the Illinois Ruan terminal was parallel to the location of the I.C.C. station. Any deviation of route was not a serious factor. The real gravamen of the charge, therefore, relates to the one-hour delay for the "unauthorized" inspection at the I.C.C. station in St. Louis.

Thus the issue presented in this case is whether the trip to the I.C.C. was a "protected activity" within the purview of § 7 of the National Labor Relations Act. The issue is not one of substantial evidence under *Universal Camera*. Rather, we are faced with questions of law: (1) whether a legal right of an employee can be proscribed by a company rule, and (2) whether the exercise of a legal right by a single employee is a protected activity under § 7. An I.C.C. inspection cannot constitute an unauthorized use during the operation of any interstate vehicle, regardless of who might initiate it. The I.C.C. regulation, § 196.5(a) states:

*"Commission personnel authorized to perform inspections.* The Chief and Assistant Chief of the Section of Field Service and the Section of Motor Carrier Safety, and all field safety specialists, mechanical engineers, safety supervisors, district supervisors, rate agents and safety inspectors employed in the Bureau of Motor Carriers are authorized, and hereby ordered, to enter upon and perform inspections of motor carriers' vehicles *in operation."* (Emphasis mine.) 49 C.F.R. § 196.5.

And § 196.4 reads:

"No motor carrier shall permit or require a driver to drive any motor vehicle revealed by inspection or operation to be in such condition that its operation would be hazardous or likely to result in a breakdown of the vehicle nor shall any driver drive any motor vehicle which by reason of its mechanical condition is so imminently hazardous to operate as to be likely to cause an accident or a breakdown of the vehicle. *If while any motor vehicle is being operated on a highway, it is discovered to be in such unsafe condition, it shall be continued in operation only to the nearest place where repairs can safely be effected,* and even such operations shall be conducted only if it be less hazardous to the public than permitting the vehicle to remain on the highway." (Emphasis mine.) 49 C.F.R. § 196.4.

Adams had both a legal right and duty to seek repair of the vehicle if he felt its operation was hazardous. His stated purpose in driving to the I.C.C. was to determine whether he had the right to have the vehicle repaired himself, since the company had refused to do so. Adams' testimony reflects that he considered driving the truck as hazardous:

"Q. On the 13th of April, did you have a personal opinion as to the maintenance for the operation of your particular truck as to its safety? A. So far as the slick tires affecting the braking effect on that truck, I did. It was my opinion that was an unneces-

sary stopping hazard that could be corrected by changing the tires. \* \* \* "

Under such circumstances the performance of lawful duty should not be condemned as unauthorized conduct. The fact that the employee arranged the inspection is immaterial. The circumstances are no different than if the I.C.C. had directed Adams to stop for inspection. An interstate driver should not be required to assume the safety of his equipment at his and the public's peril. Under the circumstances, the lawful right of the I.C.C. to inspect unsafe equipment makes subservient a company rule which actually is not relevant to the present circumstances. If consent or permission of the employer is required for safety inspections on the road, it should be implied here. It is true that the company rule prohibiting unauthorized use of company equipment is in no way intended to prevent lawful union activity. Nonetheless, where its application seeks to override the effect of I.C.C. regulations such rule is as a matter of law unreasonable. Cf. Jas. H. Matthews & Co. v. NLRB, 354 F.2d 432 (8 Cir. 1966); NLRB v. Washington Alum. Co., 370 U.S. 9, 16–17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

Section 192.7 of the Interstate Commerce Commission's regulations provides that a driver must be satisfied that all parts and accessories (specifying brakes, tires, etc.) are in good working order or else the vehicle shall not be driven. The evidence clearly demonstrates that Adams on several occasions had refused to drive vehicles because he considered them unsafe. On some of these occasions he had been sent home and told that there was no other vehicle for him to drive. The company offered evidence to show that other drivers had taken vehicles that Adams had turned down. Even though one driver may feel that the vehicle is safe and another not, a company has no right to discharge an employee who in good faith is unsatisfied with the vehicle to be driven. The company denies Adams' good faith in making complaints about the safety of the equipment. The only credible evidence available, the findings of the I.C.C.,[2] corroborates Adams' sincerity as of April 13. Furthermore, § 20.3 of the collective-bargaining agreement provides a means of protection for the company from a driver's bad faith complaints. This section reads:

"Employees shall immediately, or at the end of their shifts, report all defects of equipment. Such reports shall be made on a suitable form furnished by the Employer, and may be made in multiple copies, one copy to be retained by the employee. Such reports shall be made out on company time. *The Employer shall not ask or require any employee to take out equipment that has been reported by any other employee as being in an unsafe operating condition until same has been approved, in writing, as being safe by the mechanical department, or a qualified representative of the Employer.*" (Emphasis mine.)

Thus, a company need not be concerned that an employee may solely dictate whether a vehicle is safe for travel. If an employee reports a deficiency, the bargaining agreement provides a procedure by which the vehicle may be safely

2. The I.C.C. inspection substantiates Adams' good faith in his complaint. The I.C.C. report disclosed the following defects and violations of the I.C.C. regulations: (1) "Trailer—R.F. inside dual tire worn through 3 plies of fabric—4th ply of fabric exposed" (see I.C.C. regulation § 193.75); (2) "Trailer—M.C. 305 cargo trailer has leaking valve right side" (see I.C.C. regulation § 196.2); (3) "Tractor—one leaf broken in R.F. spring" (see I.C.C. regulation § 196.2); (4) "Tractor—stop & tail light inoperative" (see I.C.C. regulation § 193.13); (5) "Tractor—brake hoses to rear brake chambers chafing against axle housing" (see I.C.C. regulation § 193.45(c)); (6) "Tractor—center identification light inoperative" (see I.C.C. regulation § 193.13); (7) "Trailer—R.F. reflector cracked" (see I.C.C. regulation § 193.14); (8) "Trailer—L.F. outside dual tire worn smooth (no tread)" (see I.C.C. regulation § 193.75). Under the I.C.C. regulations the company was required to repair the truck and to notify the I.C.C. of this fact within 15 days.

released to another driver. This protects both the company and driver from arbitrary decisions or a "take it or leave it" attitude.

In a case with striking similarity, the Second Circuit recently upheld an employee's grievance asserted under a bargaining agreement:

"While those complaints may have been minor, they do not appear to have been mere fabrications. As the Board's decision points out, the Board need not find the complaints to be meritorious in order to hold the activity protected, but the fact that the complaints were apparently reasonable does support the conclusion that they were made for legitimate union purposes, and were not fabricated for personal motives." NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 500 (2 Cir. 1967).

## THE QUESTION OF "CONCERTED ACTIVITY"

Section 7 reads:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

It is clear that Adams' grievance as to safe working conditions relates to the scope of activity protected under § 7. Morrison-Knudsen Co. v. NLRB, 358 F. 2d 411 (9 Cir. 1966); Socony Mobil Oil Co. v. NLRB, 357 F.2d 662 (2 Cir. 1966); Walls Mfg. Co. v. NLRB, 116 U.S.App.D.C. 140, 321 F.2d 753 (1963).

In *Socony*, the court held the discharge of an employee an unfair practice, where the termination of employment follow-

ed the employee's complaint to the Coast Guard as to the "seaworthiness" of the employer's vessel. The court in discussing the bounds of lawful protected activity said:

"* * * Socony was motivated in part by Haleblian's processing the complaint. And for this reason, Socony's suspension of Haleblian was unlawful. [Citing cases] Of course, Haleblian would not be engaged in protected activity in filing the complaint if he acted in bad faith. However, the record supports a finding that the union's complaint was made not out of malice, but in a desire to bring the watch-standing problem to the Coast Guard's attention." Socony Mobil Oil Co. v. NLRB, supra, 357 F.2d at 663.

In NLRB v. Bretz Fuel Co., 210 F.2d 392, 396 (4 Cir. 1954), the court said:

"Our Court and other federal appellate courts have consistently held that concerted activity is protected only where such activity is intimately connected with the employees' immediate employment."

See also NLRB v. J. I. Case Co., 198 F. 2d 919 (8 Cir. 1952); Carter Carburetor Corp. v. NLRB, 140 F.2d 714 (8 Cir. 1944). However, not all activities of employees are protected under § 7. This is particularly true relating to activities which are contrary to the collective bargaining agreement itself. See e. g., NLRB v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939); NLRB v. Montgomery Ward & Co., 157 F.2d 486 (8 Cir. 1946); NLRB v. Draper Corp., 145 F.2d 199 (4 Cir. 1944). And, of course, unlawful activities are not sanctioned under the Act. See e. g., NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 255, 59 S.Ct. 490, 83 L.Ed. 627 (1939).

This leads me to the question as to whether Adams' activities were "concerted" under the Act. The company urges (1) that Adams acted entirely on his own and not on behalf of any other employee, (2) that Adams did not at any time seek to induce group action to protest his

grievance and (3) that Adams did not at any time go through his union to protest the grievance. Therefore, it contends that Adams' conduct at all times was not "concerted activity" under the terms of § 7.

The Board on the other hand urges that Adams at all times was acting in implementation of the collective-bargaining agreement, which amounted to an extension of the concerted activity that gave rise to that agreement. This interpretation has frequently been adopted. See NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 500 (2 Cir. 1967); B & M Excavating, Inc., 155 N.L.R.B. 1152, 1154 (1965) (dictum), enf'd per curiam, 368 F.2d 624 (9 Cir. 1966); Bunney Bros. Construction Co., 139 N.L.R.B. 1516 (1962). The Board's construction of § 7 has recently been repeated in an August 12, 1968, decision, J. A. Ferguson Constr. Co., [1968 CCH N.L.R.B. ¶ 20,112], 172 N.L.R.B. No. 165. The Board affirmed the trial examiner's findings which state:

> "As to the May 1 discharge, the only reason assigned by the employer for the discharge was Tolot's alleged conduct on April 30 in leaving his work station without permission to protest a violation of the union contract, instead of processing his complaint through the steward under the contract's grievance procedure.
>
> \*    \*    \*    \*    \*    \*
>
> "Even assuming that Tolot's request was in derogation of the grievance provisions of the contract, his conduct, nevertheless, constituted concerted activity since the 'grievance', pertained to a violation of a condition of employment prescribed in the contract, affecting not only Tolot but also all the bricklayers on the job. Since Tolot's conduct was protected concerted activity, the employer, therefore, violated Section 8(a) (1) of the Act by discharging Tolot because of such conduct."

The Board's position is persuasive. Where an individual employee asserts a right found in a collective-bargaining agreement, it is reasonable to state he is extending the terms protecting union activity. In Smith v. Evening News Ass'n, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962), the United States Supreme Court said:

> "The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotiation and administration of collective bargaining contracts. Individual claims lie at the heart of the grievance and arbitration machinery, are to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based."

The Board's argument was persuasive to the Second Circuit in their recent affirmance of the Board in NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 500 (1967), wherein Chief Judge Lumbard, speaking for the court, stated:

> "[W]hile interest on the part of fellow employees would indicate a concerted purpose, activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees."

Within the collective-bargaining agreement, involved, in addition to § 20.3 set out above are the following sections relating to conditions of work governing all employees:

> "Section 20.1.
>
> "No employee shall be compelled to take out equipment that is not mechanically sound and properly equipped to conform with all applicable city, state and federal regulations.
>
> "Section 20.2.
>
> "Under no circumstances will an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to a person or property or in violation of any applicable statute or court order; or in violation of a Government regulation relating to safety of person or equipment."

It has been made clear that § 7 of the Act is for the benefit of employees and not the union. The Fifth Circuit stated some twenty years ago:

"Contrary to a rather general misconception, the National Labor Relations Act was passed for the primary benefit of the employees as distinguished from the primary benefit to labor unions, and the prohibition of unfair labor practices designed by an employer to prevent the free exercise by employees of their wishes in reference to becoming members of a union was intended by Congress as a grant of rights to the *employees* rather than as a grant of power to the union. Consequently the right of employees lawfully to engage in concerted activities for the purpose of mutual aid, outside of a union, is specified by the Act." NLRB v. Schwartz, 146 F.2d 773, 774 (5 Cir. 1945).

Balancing the concern between individual grievances asserted by employees vis-a-vis grievances made through union representatives is well expressed by Judge Brown in NLRB v. R. C. Can Co., 328 F.2d 974, 978–979 (5 Cir. 1964):

"There cannot be bargaining in any real sense if the employer has to deal with individuals or splinter groups. And just as attempted negotiation with such groups or individuals would make a mockery out of bargaining, so, too, must bargaining negotiations by a single agency be kept free from divisive pressures generated by dissident elements. *On the other hand, a union is, or at least should be, a democratic device. The very reason for its existence is the existence of its members and others for whom the law says it acts. Consequently, the law should be slow to declare that members cannot speak effectively in behalf of their own organization and the aims and objectives*

*which it collectively seeks to assert in their behalf.* In these conflicting policies, there may be found a basis for resolution: is the action of the individuals or a small group in criticism, of, or opposition to, the policies and actions theretofore taken by the organization? Or, to the contrary, is it more nearly in support of the things which the union is trying to accomplish? If it is the former, then such divisive, dissident action is not protected. [Citing cases] *If, on the other hand, it seeks to generate support for and an acceptance of the demands put forth by the union, it is protected so long, of course, as the means used do not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union * * *."* (Emphasis mine.)

See also NLRB v. Guernsey-Muskingum Elec. Co-op., Inc., 285 F.2d 8 (6 Cir. 1960)

One definition of "concerted activities" requires them to be related to a purpose of "inducing or preparing for group action" to correct a grievance. Cf. Indiana Gear Works v. NLRB, 371 F.2d 273 (7 Cir. 1967). Another view is that the employee must be acting "with or on behalf of other employees and not solely by and on behalf of the discharged employee himself * * *." See Pacific Electricord Co. v. NLRB, 361 F.2d 310 (9 Cir. 1966). Neither view expressed, however, excludes from § 7 protection an employee who at the time is singularly asserting a "collective" right under a collective contract. For it has consistently been held that *one* employee may carry on a "concerted activity" as long as the conduct is for the purpose of, in the terms of the statute, "collective bargaining" (presumably where no contract is in existence) or other "mutual aid or protection." [3] See Morrison-Knudsen Co. v.

3. And it must be realized, despite the basic policy of the Act toward collective bargaining rather than individual bargaining, that an employee still retains the individual right to present grievances consistent with an existing collective-bar-

gaining agreement under § 9(a), which provides:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such

NLRB, supra; Socony Mobil Oil Co. v. NLRB, supra; Walls Mfg. Co. v. NLRB, supra; Salt River Valley Water Users' Ass'n v. NLRB, 206 F.2d 325, 328 (9 Cir. 1953); NLRB v. Schwartz, 146 F.2d 773 (5 Cir. 1945).

purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreethen in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment." 29 U.S.C.A. § 159(a).

When § 9(a) was originally passed by Congress, the provision relating to the presence or absence of the union representative was not written into the Act. The Ninth Circuit Court in an early comment on § 9(a) said:

"It is well to appreciate that the proviso of § 9(a) is on its face a right preserved to the employee. No doubt the reason for this is that under the scheme of collective bargaining a bare majority controls the whole body of employees and that, in this circumstance, the right should be preserved, to the individual (or a group) to go to his employer with any grievance he may harbor notwithstanding any provision in the collective agreement.

"It may also be that the Congress intended, by this proviso, to assert the policy that individuals or a group of individuals in spite of any agreement to the contrary may possess the right of registering their grievances with the employer." NLRB v. North Am. Aviation, 136 F.2d 898, 899 n. 2 (9 Cir. 1943).

In NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the United States Supreme Court recognized the right of individual employees to present grievances to their employers under § 9(a). However, the role of union representatives in such proceeding was not clarified. Later cases decided under the original § 9(a) were divided as to its meaning. In NLRB v. North Am. Aviation, Inc., supra, the court indicated that an employee could himself present and settle any grievance with his employer. However, in Hughes Tool Co. v. NLRB, 147 F.2d 69, 158 A.L.R. 1165 (5 Cir. 1945), the court held that an employee could present his grievances by himself, but that only a union representative had the right to adjust them. This case was soon followed by Elgin, Joliet, & Eastern Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), in which the United States Supreme Court held, interpreting a similar provision under the Railway Labor Act, that although unions could contract for future conditions, grievances were past violations and therefore could be handled individually by employees if they so desired.

However § 9(a) was amended in 1947 to provide that the union representative be extended the opportunity to be present at grievance proceedings. Congressional debate over whether or not employees should be given the opportunity independently to present and adjust individual grievances with their employer was vigorous on both sides. Those opposed to granting such a right asserted that it would allow employers to undermine union positions and discredit them in the eyes of the employees. Congressman Lanham stated:

"It [the proviso in § 9(a) allowing individual adjustment of grievances] is being made the proviso rather than the main part, but in such form that it actually repeals the principal section by negating the principle of collective bargaining and majority rule established by this section. To grant individual employees or minority groups of employees the right to present and settle grievances which relate to wages, hours, and conditions of employment without permitting the representative of the majority to participate in the conference and join in any adjustment is to undermine the very foundations of the act. To create rivalry, to play of one group of employees against another, to confuse employees would completely undermine collective-bargaining representatives and would be disasterous." 93 Cong.Rec. 3702 (April 17, 1947) (Remarks of Mr. Lanham.)

In answer to this argument it was suggested that unions would be able to prevent employers from undermining union positions by drafting collective-bargaining agreements so as to prohibit such practices, since § 9(a) would specifically provide that adjustment of individual

Thus, to foreclose Adams' activities in the instant case as not being "concerted" merely because he did not have an assistant in his truck at the time he reported safety deficiencies or when he sought the I.C.C. inspection is too superficial a guideline. The statutory meaning of the words "concerted activity" can best be derived from the other words with which they are associated. See Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 752 (4 Cir. 1949). The words "concerted activity" are directly related and defined in terms of their intended purpose of "collective bargaining" or other "mutual aid or protection." The phrases are interrelated and derive substantive meaning from each other. This does not mean that an individual employee may be protected under § 7 when he asserts only an individual protest which perhaps is vented by reason of personal animosity or is unrelated to group interest or concern or is otherwise unrelated to a right set forth in a collective-bargaining agreement. Cf. Mushroom Transp. Co. v. NLRB, 330 F.2d 683 (3 Cir. 1964); Joanna Cotton Mills Co. v. NLRB, supra. Nor is a personal protest over wages (in the absence of a collective-bargaining agreement) protected as a "concerted activity," NLRB v. Westinghouse Elec. Corp., 179 F.2d 507 (6 Cir. 1949); [4] nor a personal grievance over a change of a foreman, American Art Clay Co. v. NLRB, 328 F.2d 88 (7 Cir. 1964); nor "griping" to other employees, NLRB v. Office Towel Supply Co., 201 F.2d 838 (2 Cir. 1953). For a single employee to carry on a "concerted activity" within the meaning of § 7, there must be the nexus stated. Although "mutual aid" may be effected in different ways,[5] it is a reasonable and

---

grievances be "not inconsistent" with the collective-bargining agreement. See generally Comment, Individual Employee Grievances Under the Wagner and Taft-Hartley Acts, 1949 Wisc.L.Rev. 154.

Ultimately, of course, the proviso was enacted, and Senator Taft said in support thereof:

"An amendment contained in the revised proviso for Section 9(a) clarifies the right of individual employees or groups of employees to present grievances. The Board has not given full effect to this right as defined in the present statute since it has adopted a doctrine that if there is a bargaining representative he must be consulted at every stage of the grievance procedure, even though the individual employee might prefer to exercise his right to confer with his employer alone. The current Board practice received some support from the courts in the *Hughes Tool Case* (147 F.2d 69), a decision which seems inconsistent with another court's reversal of the Board in N. L. L. B. v. North American Aviation Company (136 F.2d 898). The revised language would make it clear that the employee's right to present grievances exists independently of the rights of the bargaining representative, if the bargaining representative has been given the opportunity to be present at the adjustment, unless the adjustment is contrary to the terms of the collective-bargaining agreement then in effect."

Sen.Rep. No. 105, 80th Cong., 1st Sess. 1126 (1947). (Remarks of Senator Taft.)

And under amended § 9(a) although an employee has a right to present grievances to his employer the employer is under no obligation to adjust the grievances. Woody v. Sterling Alum. Prods., Inc., 365 F.2d 448 (8 Cir. 1966). See also, discussion of an employee's rights under grievance procedures as well as under § 301 of Act, in Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed. 2d 246 (1962); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). And see generally, Lewis, Fair Representation in Grievance Administration: Vaca v. Sipes, 1967, S.Ct.Rev. 81.

4. Cf. Norfolk Conveyor, Div. of Jervis v. B. Webb Co. and Peter Dubuigny, 159 N.L.R.B. No. 60. Where wages are fixed in a collective-bargaining agreement and the individual employee protests concerning the same, the protest is not consistent with any rights found in the contract. Under these circumstances the Board has upheld the discharge.

5. Another form of "mutual aid" that is protected may be actually foreign to any direct benefit any employee may receive. As the court stated in NLRB v. Peter C.K. Swiss Choc. Co., 130 F.2d 503, 505–506 (2 Cir. 1942):

"Certainly nothing elsewhere in the act limits the scope of the language to

necessary construction of the Act that "concerted activity" may exist if there is some reasonable relationship connecting an employee's conduct with the "mutual aid and protection" of other employees and such activity is based upon rights collectively recognized within a bargaining agreement.

Thus, I conclude that "concerted activity" may exist under § 7 where an individual employee implements the rights of the group as expressed in a collective-bargaining instrument, *if the purpose of his conduct is for the "mutual aid and protection" of all employees*. I find no reasoning or rationale which conflicts with this view of § 7. It might be urged that the overall policy of the Act may better be served if the individual processes his grievance through the union representative. However, where he is asserting a right consistent with the collective contract, both §§ 9(a) and 7 give him a right to proceed alone. Congress obviously intended through § 9 and § 7 to recognize that an individual employee's rights are not totally submerged by the group when assertion of those rights is otherwise consistent with the interest of the group. To reason otherwise is to deny the very purpose for which the union exists; that is, the protection of the rights of the individual employee.[6]

---

'activities' designed to benefit other 'employees'; and its rationale forbids such a limitation. When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts. So too of those engaging in a 'sympathetic strike,' or 'secondary boycott' the immediate quarrel does not itself concern them, but by extending the number of those who will make the enemy of one the enemy of all, the power of each is vastly increased. It is one thing how far a community should allow such power to grow; but, whatever may be the proper place to check it, each separate extension is certainly a step in 'mutual aid or protection.' "

6. The desire to protect concerted activities has long been manifest in labor legislation. Section 7(a) of the National Industrial Recovery Act was among the first to provide explicitly that "concerted activities for the purpose of collective bargaining or other mutual aid or protection" shall not be interfered with. The congressional intent as to the precise meaning and application of "concerted activities" is not disclosed in the Senate and House committee reports on the bill. See, e. g., S.Rep. No. 114, 73d Cong., 1st Sess. (1933); H.R.Rep. No. 159, 73d Cong., 1st Sess. (1933). However, the wording was carried over into the Wagner Act and other subsequent pieces of labor legislation. The Committee on Labor reported on May 20, 1935, regarding § 7(a) of the Wagner Act:

"The time for appropriate action by the Congress is at hand, because on June 16, 1935, the National Industrial Recovery Act, and Public Resolution 44, Seventy-third Congress, expire by limitation. The Congress does not propose to withdraw the 'new charter of rights' enacted in section 7(a). The only honest thing for the Congress to do, therefore, is to provide adequate machinery for its enforcement, which is the object of the present bill.

" * * * Section 7(a), as it now appears in the National Industrial Recovery Act, is amplified by the specific prohibition of certain unfair-labor practices, which by fair interpretation would constitute infringements upon the substantive rights of employees declared in section 7(a)." H.R.Rep. No. 969, 74th Cong., 1st Sess. 6 (1935).
See also S.Rep. No. 573, 74th Cong., 1st Sess. (1935); H.R.Rep. No. 1147, 74th Cong., 1st Sess. (1935).

Under the Wagner Act the legal sanction of "concerted activities" is undoubtedly an expression of legislative concern growing out of the early common-law anomaly which permitted individual conduct, but proscribed the same activity by two or more persons acting collectively. As stated in an early English case:
"As in the case of journeymen conspiring to raise their wages; each may in-

The Court of Appeals for the District of Columbia has said:

"Whether an activity is protected or not depends not only on the wording and purposes of the Act, but on the precise nature and *effect* of the employee's conduct." International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 112 U.S.App.D.C. 30, 299 F.2d 114, 117 (1962). (Emphasis mine.)

In other words, the test "is not the motive of the participants * * * but the 'purpose' of the activity." Joanna Cotton Mills v. NLRB, supra. Several factors in the instant case demonstrably show the protected "effect" of Adams' conduct.

First, the grievance filed by Adams in February led immediately to the posting of a company rule which was for the "mutual aid or protection" of all drivers. Secondly, Adams' protest to the I.C.C. arose out of the company practice of not immediately processing the drivers' safety reports. This resulted in the company reassigning defective equipment for operation without the mechanical certification required under the contract. To reason that correction of such a practice is not in the interests of all drivers is to ignore the collective benefits of the terms of the bargaining agreement itself.

I cannot agree with the company's assertion that the defects found by the I.C.C. were "minor" in nature or with the majority's implication that the vehicle was still safe to drive.[7] Nor is the company's excuse that they did not have time to process Adams' April 12 report reasonable. Such a practice violates their bargaining agreement.

Finally, the company urges that they were not aware that Adams was acting for the mutual aid or protection of other employees. This argument ignores the obvious knowledge of respondent as to the rights of all employees clearly written within the collective-bargaining agreement. These rights do not exist in a vacuum. It is well settled the employee need not use the most reasonable form to express his grievance. NLRB v. Washington Alum. Co., 370 U.S. 9, 16, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1961).

We have long recognized that discharge of an employee for wrongful conduct is an inherent power of management and one expressly protected by law. See e. g., Farmers Co-op Co. v. NLRB, 208 F.2d 296 (8 Cir. 1953); Broadway Motors Ford, Inc. v. NLRB, 395 F.2d 337 (8 Cir. 1968). However, such "wrongful conduct" cannot be used as a pretext to defeat the collective rights of employees which are otherwise safeguarded under § 7 of the Act. Nor should we approve an employee's discharge which serves to condone a company's noncompliance with laws enacted not only for the safety of its employees but for the public as well.

Finding a discharge for protected "concerted activities" under § 7, for the mutual benefit of all employees, I would grant enforcement of the Board's order.

sist on raising his wages if he can; but if several meet for the same purpose, it is illegal, and the parties may be indicted for a conspiracy." Rex v. Mawbey, 6 T.R. 619, 636 (1796).

And compare Arthur v. Oakes, 63 F. 310 (7 Cir. 1894), with Mr. Justice Holmes' dissent in Vegelahn v. Guntner, 167 Mass. 92, 44 N.E. 1077, 35 L.R.A. 722 (1896), where he stated:

"But there is a notion which latterly has been insisted on a good deal, that a combination of person to do what any one of them lawfully might do by himself will make the otherwise lawful conduct unlawful. It would be rash to say that some as yet unformulated truth may not be hidden under this proposition. But in the general form in which it has been presented and accepted by many courts, I think it plainly untrue, both on authority and on principle."

For the early history of the labor movement and the evolution of the recognition of "concerted conduct," see Landis & Manoff, Labor Law, ch. 1 (2d ed. 1942); Early American Labor Cases, 35 Yale L.J. 825 (1926).

7. The fact that the vehicle was operable does not mean that it was safe to drive. More importantly, its continued operation violated the public safety laws of the State of Missouri as well as the I.C.C. regulations. See, e. g., Ann.Mo.Stat. §§ 304.380, 304.560 and 304.570 (1963).